## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| W. GLENN ELLERBE | : | |
| d/b/a Ellerbe Associates | : | |
| Consultancy | : | |
| 12009 Kilbride Dr. | : | |
| Cincinnati, OH 45251 | : | Case No. 2016 cv 02318 |
| | : | |
| **Plaintiffs,** | : | Judge _____ |
| | : | |
| **v.** | : | |
| | : | |
| **GORMAN HEALTH GROUP, LLC,** | : | |
| 5335 Wisconsin Ave. NW, Ste. 340 | : | **COMPLAINT WITH JURY** |
| Washington, DC 20015 | : | **DEMAND ENDORSED HEREIN** |
| | : | |
| Serve: Brian L. Schwalb, Esq. | : | |
| VENABLE LLP | : | |
| 575 7th Street, NW | : | |
| Washington, DC 20004 | : | |
| | : | |
| **and** | : | |
| | : | |
| **MEDICARE MEMBER** | : | |
| **SERVICES, LLC,** | : | |
| 5335 Wisconsin Ave. NW, Ste. 340 | : | |
| Washington, DC 20015 | : | |
| | : | |
| Serve: Brian L. Schwalb, Esq. | : | |
| VENABLE LLP | : | |
| 575 7th Street, NW | : | |
| Washington, DC 20004 | : | |
| | : | |
| **and** | : | |
| | : | |
| **GORMAN MEMBER** | : | |
| **SERVICES, LLC** | : | |
| 5335 Wisconsin Ave. NW, Ste. 340 | : | |
| Washington, DC 20015 | : | |
| | : | |
| Serve: Brian L. Schwalb, Esq. | : | |
| VENABLE LLP | : | |
| 575 7th Street, NW | : | |
| Washington, DC 20004 | : | |
| | : | |
| **Defendants.** | | |

NOW COMES Plaintiff, W. Glenn Ellerbe, doing business as Ellerbe Associates Consultancy ("EAC"), by and through counsel, and, for his Complaint against Defendants Gorman Health Group, LLC, Medicare Member Services, LLC, and Gorman Member Services, LLC, hereby states as follows:

## INTRODUCTION

This lawsuit arises out of Defendant Gorman Health Group's attempt to avoid its obligations to compensate Plaintiff for the 2007 purchase of the Medicare Part D enrollment/payment reconciliation data analysis software developed by Plaintiff and known as "Valencia." Defendant contends that it owes Plaintiff nothing under the 2007 purchase agreement because it ceased using Valencia in 2009. In reality, Gorman Health Group transferred all of its Valencia clients, data, and software to a wholly owned subsidiary, *i.e.*, Defendant Medicare Member Services, LLC, and began using "Valencia 2.0." Defendants have earned approximately tens of millions of dollars from their use of Valencia, including "2.0," and Plaintiff is entitled to 10 percent of that total. Plaintiff has only been paid approximately $235,000.

## JURISDICTION AND VENUE

1.      Plaintiff W. Glenn Ellerbe ("Mr. Ellerbe") is a natural person residing at 12009 Kilbride Drive, Cincinnati, Ohio 45251.

2.      Defendant Gorman Health Group, LLC ("GHG"), is a District of Columbia limited liability company with its principal office at 5335 Wisconsin Avenue NW, Suite 340, Washington, D.C. 20015.

3.      Defendant Medicare Member Services, LLC ("MMS"), is a District of Columbia limited liability company with its principal office at 5335 Wisconsin Avenue

NW, Suite 340, Washington, D.C. 20015.  MMS is a wholly owned subsidiary of GHG and is controlled by the same persons who control GHG.  MMS is named as a defendant by virtue of any interests it may claim in Valencia, regardless of whether it is described as version "2.0," which may be affected or cutoff by the rescission of the agreement at issue in this action.

4.     Defendant Gorman Member Services, LLC ("GMS"), is a Delaware limited liability company with its principal office located at 5335 Wisconsin Avenue NW, Suite 340, Washington, D.C. 20015.  GMS is a wholly owned subsidiary of MMS and is controlled by the same persons who control GHG and MMS.  GMS is named as a defendant by virtue of any interests it may claim in Valencia, regardless of whether it is described as version "2.0," which may be affected or cutoff by the rescission of the agreement at issue in this action.

5.     Jurisdiction and venue are appropriate in the United States District Court for the District of Columbia per 28 U.S.C. § 1332 as there is complete diversity and the amount in controversy is in excess of $75,000.  Furthermore, the agreement at issue in this lawsuit contains District of Columbia choice of law and venue provisions.

## STATEMENT OF FACTS

6.     Plaintiff's relationship with GHG began in 1997 when Mr. Ellerbe began working as an independent contractor with John Gorman at Managed Care Compliance Solutions.  Ellerbe developed and implemented software that reconciled payments, billings, membership, *etc.*  Ellerbe's reconciliation software was highly successful.

7.     After working with Mr. Gorman for approximately eight years, Mr. Ellerbe became a member of GHG in 2005.  Mr. Ellerbe is an employee and member of GHG to

date.

8.      In 2006, the Centers for Medicare and Medicaid Services ("CMS") implemented Medicare Part D.  CMS moved from the McCoy System and GROUCH Reports to the current Medicare Advantage and Part D system (MARx).  MARx included 75 specific reports requiring reconciliation, and the launch of Medicare Part D was fraught with problems and complexity.

9.      Seeing an opportunity, Mr. Ellerbe, individually and doing business as EAC, developed the Medicare Part D enrollment/payment reconciliation data analysis software known as "Valencia."  Though Mr. Ellerbe was also a member in and employee of GHG at the time Valencia was developed, EAC's work was unrelated to GHG and GHG played no role in the development of Valencia.

10.     GHG began offering services to its customers in or about 2006 using Valencia and contracting with EAC to provide the actual services.

11.     Valencia was an instant success even as a prototype, and GHG immediately saw the opportunities the software presented.  Specifically, GHG estimated that Valencia could generate between $5-8,000,000 in revenue annually.[1]

12.     Plaintiff and GHG began discussing a deal to further develop Valencia while allowing GHG to market it.  Plaintiff was hosting and developing Valencia for GHG during this time and it was ultimately decided that a larger entity would be needed to host the vast amounts of data from GHG's customers that Valencia would need to process.  Thus, GHG began exploring partnership options with third parties while Plaintiff and GHG discussed possible terms of the sale of Valencia to GHG.

---

[1] November 14, 2006 email from GHG's Senior Vice President of Strategic Development to Mr. Ellerbe, attached hereto as **Exhibit 1**.

13.    GHG decided that a larger partnership was not advantageous and sought

vendors with the capabilities to host and develop Valencia.  Specifically, GHG sought:

> interested parties willing to support a new service aimed at
> reconciling enrollment and payment operations for Medicare Part D
> sponsors.  GHG has built a prototype tool that is presently being
> used by our consultants on-site at health plan clients. We wish to
> enhance, standardize, and extend this tool's capabilities. The end
> solution is not intended to be a stand-alone application, or third-
> party software that simply produces "flat" enrollment discrepancy
> reports; rather, the tool will support a service that produces
> actionable reports and data extracts to support enrollment and
> prescription drug event "fixes" within health plan systems. The tool
> identifies discrepancies between CMS and health plan data files,
> which when reconciled, diminishes the potential financial liability
> between the health plan and CMS.[2]

Notably, GHG was planning on "enhancing" and "extending the capabilities" of Valencia

in May 2007, *i.e.*, five months before it purchased Valencia from Plaintiff.

14.    In October 2007, EAC and GHG entered into the "Valencia Software

Purchase and Development, Maintenance and Support Agreement" (the "Agreement").[3]

15.    The Agreement provided that EAC would assist in the future development

of Valencia, including the addition of new functionalities.  The Agreement also

contemplated the "transition of hosting, processing, and future development of

Valencia, in whole or in part, to a third party vendor." Agreement, Section 2.1.  This

provision matched what the parties already knew: that GHG was planning on hiring a

third-party vendor to replace EAC.

---

[2] May 2007 Request for Vendor Qualifications, attached hereto as **Exhibit 2**.

[3] A copy of the Agreement is attached hereto as **Exhibit 3**.  Mr. Ellerbe has operated
EAC as a sole proprietorship.  He has complied with all material terms of the
Agreement, and provided all benefits to Defendants described in and contemplated by
the Agreement.

16.     Bearing in mind that GHG estimated Valencia would generate between $5-8,000,000 annually, GHG and EAC agreed that EAC would be paid "the purchase price of $150,000 **plus**" (emphasis supplied) additional percentages of revenue generated moving forward.  Agreement, Section 2.

17.     If a third-party vendor began hosting Valencia, EAC was entitled to 10 percent of GHG's revenue earned on any data analytics project in which Valencia was used.  Agreement, Section 2.1.

18.     If GHG developed and licensed "any 'leave behind' application software, which include[d] as a material portion of its programming code a substantial part of Valencia as delivered by EAC," then EAC was entitled to 10 percent of gross revenues earned from the licensing.  Agreement, Section 2.2.

19.     If GHG sold Valencia (or if GHG were to be sold), EAC was entitled to 10 percent of the net proceeds less the initial $150,000 payment from GHG.  Agreement, Section 2.3.

20.     Thus, it was understood by Mr. Ellerbe and GHG that Valencia would continue to be developed, including the additions of new functionalities and applications.  It was further understood by Mr. Ellerbe and GHG that the lion's share of EAC's compensation from the sale of Valencia would be generated as Valencia was used and developed in the future.

21.     Following the execution of the Agreement, GHG paid a portion of the purchase price (*i.e.*, $150,000) and transitioned hosting and development of Valencia from EAC to a third-party vendor, ViPS.  Plaintiff worked hand-in-hand with ViPS through coding, data loads, configuration, operation, and enhancing Valencia.

22.    Despite earning revenue from the use of Valencia, GHG failed to make the required "royalty" payments.  Mr. Ellerbe reached out to GHG in June 2008 to address this issue and GHG acknowledged its obligation to pay 10 percent of revenues to EAC.[4]

23.    Thereafter, GHG began looking for a partner, rather than a third-party vendor, to host and continue developing Valencia.

24.    The idea of creating a leave-behind product that would be "licensed" to customers was contemplated by the parties and expressed in the Agreement, which provides that EAC is entitled to 10 percent of GHG's gross revenue from any such licensing arrangements.  Agreement, Section 2.2.

25.    Unbeknown to EAC, GHG transferred ownership of Valencia free-of-charge to its wholly owned subsidiary, MMS in anticipation of a joint venture with a new partner, an entity called Greenhawk.

26.    MMS, in turn, agreed that it "will grant, or cause to be granted, a non-exclusive, perpetual, irrevocable, non-transferable license of its existing Valencia 1.0 software and intellectual property, including copyrighted materials associated with the software, to NewCo (Defendant GMS), solely for the purpose of aiding the development of the PDE module portion of the Valencia 2.0 software."[5]

27.    Thus, GHG—via MMS—provided Valencia to Greenhawk free-of-charge for the express purpose of developing Valencia "2.0.".

---

[4] June 2008 email exchange, attached hereto as **Exhibit 4**.

[5] Term Sheet, attached hereto as **Exhibit 5**.

28.     GHG asked EAC to work with Greenhawk to develop what it now calls Valencia "2.0." As it had previously worked with ViPS, Plaintiff worked hand-in-hand with GMS to develop this derivative of Valencia 1.0.

29.     Despite being called "2.0" internally, Valencia "2.0" was—and is still to this day—marketed as simply "Valencia." Furthermore, the core functionalities of Valencia have remained unchanged, and the Valencia "2.0" that Greenhawk was required to provide as its capital contribution to GMS specifically required the Valencia functionalities developed by Plaintiff . Valencia 2.0 is a derivative of Valencia 1.0. In this regard, a material portion of Valencia 2.0's programming code includes a substantial portion of Valencia 1.0 as delivered by Plaintiff.

30.     GHG never asserted that Valencia "2.0" was a different product from Valencia, and EAC had no reason to know that GHG considered Valencia and Valencia "2.0" to be different products. Indeed, the functionalities and user interfaces of "2.0" were the same as the Valencia that GHG provided to Greenhawk.

31.     Furthermore, GHG also provided its Valencia sales force and customer lists to GMS for the purpose of marketing "2.0" to GHG's existing Valencia customers. GHG also ceased promoting Valencia so as to not compete with GMS and "2.0". In other words, GHG appeared to do nothing more than shift a major asset—Valencia—to a holding company.

32.     Plaintiff did not become aware of the fact that GHG considered "2.0" to be a different product until September 2016. At that time GHG rejected Plaintiffs demand for royalty payments due under the Agreement by asserting that "2.0" is an "entirely different" product.

33.     GHG cut Mr. Ellerbe's compensation by approximately 90 percent on or about August 19, 2016 and sent Mr. Ellerbe a Separation Agreement and General Release on August 25, 2016.  The Separation Agreement and General Release laid out different options for Mr. Ellerbe's consideration.

34.     During this time, GHG had been, and is believed to be currently, preparing for a sale of some or all of GHG's assets.  The substance of the potential sale is unknown to Mr. Ellerbe.

35.     Mr. Ellerbe responded through counsel on September 6, 2016 to GHG's August 19 and 25 communications and, among other things, requested a reconciliation of the amounts due under the Valencia Agreement.

36.     GHG claims the Separation Agreement and General Release was sent to Mr. Ellerbe by mistake and refused to perform any reconciliation under the Valencia Agreement.

37.     GHG, via its corporate counsel, addressed Plaintiff's request during a September 27, 2016 conference call with counsel for Mr. Ellerbe.  During that call, GHG claimed—for the first time—that Valencia "2.0" is a "completely different product" that was developed "independently" of Valencia.

38.     The claim that Valencia "2.0" was developed "independently" was known to be false at the time it was made.  GHG provided Valencia to Greenhawk for the express purpose of developing Valencia "2.0."  Further, many of the same people involved in the development of Valencia assisted Greenhawk in the development of Valencia 2.0.  Valencia 2.0 includes much of the same functionality of Valencia 1.0 and a material portion of Valencia 2.0's programming code includes substantial portions of Valencia 1.0.

39.     Notwithstanding the falsity of GHG's claim regarding the development of Valencia "2.0," Plaintiff remained open-minded to GHG's claim that Valencia and Valencia "2.0" are, in fact, "completely different product[s]."

40.     Plaintiff repeatedly requested copies of the Valencia and Valencia "2.0" programs for the purpose of verifying GHG's claim.  Plaintiff's requests were coupled with offers to take steps necessary to protect GHG's interests, *e.g.*, entering a non-disclosure agreement, *etc.*  Plaintiff also offered to review any and all documents GHG wished to produce to support his claim that Valencia and Valencia "2.0" are "completely different product[s]."

41.     GHG refused to provide any support for its claim that the Valencia 1.0 and 2.0 are completely different products.

42.     GHG apparently expected Plaintiff to abandon his claim under the Valencia Agreement for 10 percent of the revenue Valencia generated based on nothing more than GHG's assertion—which GHG was unwilling and/or unable to substantiate – that the Valencia 2.0's codes were completely different from Valencia 1.0's codes.

43.     GHG then threatened to file a counterclaim, seek sanctions and expel Mr. Ellerbe as a member of GHG if he filed the instant lawsuit.

44.     GHG further advised that Mr. Ellerbe—despite being a member—would not be provided any information regarding GHG's upcoming sale.  GHG also advised other members not to discuss this matter with Mr. Ellerbe and cut off Mr. Ellerbe's access to financial information regarding GHG.

45.     Mr. Ellerbe inquired as to the legal basis for GHG's decision to cut him off from access to information unrelated to the instant Valencia dispute and none was provided.

46.     The crux of GHG's threatened counterclaim and sanctions was that any claim for rescission of the Valencia Agreement would be made in bad faith for the purpose of clouding title to Valencia "2.0" to hold up the impending sale to secure a more favorable financial outcome for Mr. Ellerbe.

47.     However, Mr. Ellerbe is not aware of whether GHG is considering the sale of Valencia "2.0," and GHG has refused to provide such information despite repeated requests for the same.

48.     Despite these facts, Mr. Ellerbe reached out yet again on November 11, 2016 in an attempt to resolve this matter without the necessity of the instant lawsuit.[6]

49.     Mr. Ellerbe renewed his request to compare the Valencia and Valencia "2.0" programs, as well as his offers to enter into a non-disclosure agreement, *etc.*, to protect GHG's interests, in order to determine whether GHG's claims regarding the independent development of Valencia 2.0 were indeed accurate.

50.     Mr. Ellerbe also requested access to GHG's books, consistent with the terms of the Operating Agreement and DC Code § 29-804.10.

51.     GHG has nonetheless failed and refused to provide access to its books and financial records.

## COUNT I
## BREACH OF CONTRACT
## (Development, Maintenance and Support Agreement/ Valencia)

52.     Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

53.     Plaintiff has fully performed all obligations under the Agreement.

54.     The Agreement requires GHG to remit 10 percent of the gross revenues

---

[6] A copy of the November 11, 2016 letter is attached hereto as **Exhibit 6**.

generated by Valencia, whether by its use, licensing or sale of Valencia.

55.    Despite earning tens of millions of dollars from Valencia, GHG has materially breached the Agreement by, among other things, failing and refusing to pay amounts due and owing to Plaintiff.

56.    Additionally, GHG materially breached its implied duty of good faith under the Agreement through its unlawful attempts to cut off Plaintiff's rights under the Agreement by giving Valencia away free-of-charge to a wholly owned subsidiary and otherwise breaching the Valencia Agreement, all in an attempt to avoid its obligation to Plaintiff.

57.    Plaintiff is entitled to 10 percent of the tens of millions of dollars GHG has earned from Valencia.

58.    As the direct and proximate result of GHG's breach of the Agreement, Plaintiff has suffered damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

## COUNT II
## IMPLIED CONTRACT

59.    Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

60.    Plaintiff has fully performed all obligations under the Agreement, under such circumstances that made plain to GHG that, as set forth in the Agreement, the services were performed for GHG, and the services were not performed gratuitously, but with the expectation that Plaintiff would be compensated, in the manner set forth in the Valencia Agreement.

61.    As set forth above, the services of Plaintiff were beneficial to GHG.

62.     Although Plaintiff maintains that there is in place an express contract between the parties hereto, to the extent that it is determined that no express contract exists between them, there is an implied contract between them, whose terms are set forth in the Valencia Agreement.

63.     Despite earning approximately tens of millions of dollars from Valencia, GHG has materially breached the implied contract by, among other things, failing and refusing to pay amounts due and owing to Plaintiff.

64.     GHG materially breached its implied duty of good faith under the implied contract through its unlawful attempts to cut off Plaintifff's rights under the Agreement by giving Valencia away free-of-charge to a wholly owned subsidiary and otherwise breaching the Valencia Agreement, all in an attempt to avoid its obligation to Plaintiff.

65.     Plaintiff is entitled to 10 percent of the tens of millions of dollars GHG has earned from Valencia.

66.     As the direct and proximate result of GHG's breach of the implied contract, Plaintiff has suffered damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**

67.     Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

68.     As set forth above, the Plaintiff conferred substantial and valuable benefits upon the Defendants.

69.     The Defendants have retained those benefits.

70.     Under the circumstances, it would be unjust to permit the Defendants to

retain the benefits without compensating the Plaintiff in a manner consistent with the terms of the Agreement.

71.    Thus, although Plaintiff maintains that there is in place an express contract between the parties hereto, to the extent that it is determined that no express contract exists between them, there is a quasi-contract between them, which Defendants have breached by failing and refusing to fairly and justly compensate Plaintiff.

72.    Plaintiff is entitled to restitution in an amount consistent with the terms of the Agreement.

**COUNT IV**
**BREACH OF CONTRACT**
**(Operating Agreement)**

73.    Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

74.    Mr. Ellerbe is entitled to access to GHG's books and other financial and corporate records as a member under the GHG Operating Agreement.[7]

75.    Mr. Ellerbe requested access to GHG's books and other financial and corporate records but GHG has refused to provide the same in breach of the Operating Agreement.

76.    Mr. Ellerbe is entitled to information regarding GHG's operations, including the terms of any proposed sale, under the Operating Agreement as a member in the member-managed limited liability company.

77.    GHG has wrongfully refused to provide information to Mr. Ellerbe regarding GHG's operations while providing the same to other members.

78.    Mr. Ellerbe is entitled to participate in the control and managements of

---

[7] A copy of the GHG Operating Agreement is attached hereto as **Exhibit 7**.

GHG under the Operating Agreement as a member holding a voting interest in the member-managed limited liability company.

79.     GHG has wrongfully cut off Mr. Ellerbe's ability to participate in the control and management of GHG by excluding him from having access to necessary information.

80.     As the direct and proximate result of GHG's breaches, Mr. Ellerbe has suffered damages, and will suffer damage in the future.

## COUNT V
## VIOLATION OF D.C. CODE §29-804.10

81.     Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

82.     Mr. Ellerbe has provided to GHG reasonable notice of his desire to inspect records maintained by the company regarding the company's activities and affairs, financial condition, and other circumstances which the company knows and are material to the proper exercise of Mr. Ellerbe's rights and duties under the Operating Agreement and under the D.C. Limited Liability Company Act, particularly in light of the pending sale of GHG.

83.     Although Mr. Ellerbe has provided such reasonable notice, GHG has failed and refused to timely furnish the aforesaid documents and information.

## COUNT VI
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

84.     Plaintiff repeats and reiterates each and every preceding paragraph as if fully stated herein.

85.     Mr. Ellerbe is entitled to injunctive relief requiring GHG to: (i) grant Mr.

Ellerbe access to its books in accordance with the Operating Agreement and applicable District of Columbia law; (ii) provide Mr. Ellerbe with all information provided and/or available to other members of GHG with the exception of information regarding the instant Valencia dispute; and (iii) permit Mr. Ellerbe to participate in the control and operations of GHG.

**WHEREFORE**, Plaintiff, respectfully request that this Court grant the following relief:

   a. for compensatory and punitive damages in an amount in excess of the Court's jurisdictional threshold, to be determined at trial;

   b. alternatively, for rescission of the Valencia Agreement or implied contract and reinstatement of Plaintiff as the owner of the Valencia software;

   c. alternatively, for restitution in an amount consistent with the terms of the Valencia Agreement;

   d. for preliminary and permanent injunctive relief requiring Defendant Gorman Health Group, LLC, to: (i) provide access to Mr. Ellerbe to its books and records as required by the Operating Agreement and the District of Columbia Limited Liability Company Act; (ii) provide Mr. Ellerbe with all information provided and/or available to other members of GHG with the exception of information regarding the instant Valencia dispute; and (iii) permit Mr. Ellerbe to participate in the control and operations of GHG.

   e. for Plaintiff's costs and expenses incurred in the prosecution of this Complaint, including reasonable attorney's fees;

   f. for pre-and post-judgment interest on all amounts awarded; and

g.      for such other and further relief to which the Court deems Plaintiff

entitled.

## JURY DEMAND

Plaintiff demands a jury for all accounts so triable.


Respectfully submitted,


Jeffrey C. Seaman (466509)
WHITEFORD, TAYLOR & PRESTON L.L.P.
7501 Wisconsin Avenue, Suite 700W
Bethesda, MD 20814
 (301) 804-3610
(301) 215-6359 (facsimile)
jseaman@wtplaw.com


Steven E. Tiller  (444991)
WHITEFORD, TAYLOR & PRESTON L.L.P.
7 St. Paul Street
Baltimore, MD  21202
(410) 347-9425
(410) 223-4325 (facsimile)
stiller@wtplaw.com


*Trial Attorneys for Plaintiff*